Good morning. We have one case to hear this morning. It is 22-4054, CBB v. Elite Comfort Solutions, et al. Would counsel for appellant make the appearance and then proceed, please. Good morning, Your Honor. Stephen Larson for the appellant, CBB. Proceed, please. Thank you, Your Honors. I may have pleased the court. I just want to begin by thanking this court for granting the brief extension due to my illness two weeks ago. It's the first time in 33 years that I've had to postpone something like this, and I really appreciate that. Of course. So, Your Honors, I think as an overview to the argument here, I want to begin by underscoring which I know is probably on your mind, the procedural posture of this case. We are at the 12B stage, and it is at the pleading stage where the facts alleged in the complaint are assumed to be true. And we allege petition-related activity, and we allege non-petition-related activity. But there's an interlocking and interrelatedness of all that activity, which we believe constitutes a clear basis for all of the claims, all of the causes that we've set forth in the complaint, that the defendants in this case have clear notice of what it is that we are seeking. There is a level of specificity here, quite frankly, that I think exceeds the standards for each of the different claims. Procedurally, we were left in an odd position with respect to the non-petitioning activity and the claims related to that non-petitioning activity. The district court did dismiss without prejudice, but without giving us leave to amend. So at a minimum, I believe that this court needs to remand this case to allow us the opportunity to amend the complaint. Did you file a motion for leave to amend? We did in our initial motion. We asked for leave to amend, but we did not file a supplemental motion, if that's what Your Honor is asking. There was a motion to dismiss in a hearing, and you were allowed to amend after that hearing, right? Yes. This is the first amended complaint that's before this court right now. So what I'm getting at is with respect to the first admitted complaint, did you file a separate motion, or was this something you incorporated in your motion practice where you said at the end of your response to the motion to dismiss, if you don't deny the motion to dismiss, you should let amend? It's the latter, Your Honor. Okay. Are you familiar with our case in Brooks v. Mentor Worldwide? I'm not, Your Honor. Okay. I think in that case, we found that the type of amendment request that you made in this case would be insufficient, that you needed to separately seek amendment. Okay. Fair enough. And so then what I would argue then, as we have argued on this appeal, that the district court simply got this wrong, and that this should be reversed then and sent back to the district court on the basis of the first amended complaint. Reading this first amended complaint, and I know it's before this court, it goes beyond, and as I indicated a client's. Mr. Larson, let me talk about two salient examples that at least give me pause with that statement that you're making. One relates to the district court's continual reference to the fact that there was a collective defendant, I mean, a collective, yeah, collective defendant problem in the sense that there wasn't a disaggregation of the defendants alleged to do the wrongful conduct. And that's the first thing. And so I want you to respond to why that's not true. And the second, if I can just articulate it now, is on, for example, in the allegation related to the Made in America claims, you didn't even identify the products that supposedly were at issue, is my recollection in the amended complaint, that were supposedly the source of the grievance regarding the Made in America, the fact that somehow or other that was a falsehood. And so if you would address those two issues that speak to whether in fact, this was a specific complaint, I'd appreciate it. Yes, Your Honor, two points on the first question related to the collective accusation against the defendants. Number one, it was not by the court. That's a procedural argument. I don't think that's the best argument. The best argument, Your Honor, is the nature of the allegations here. As I was about to, as I was concluding my remarks a moment ago, I noted this is an antitrust case. This is an antitrust conspiracy case. These eight defendants worked in concert. And in a way, as alleged in our complaint, that makes it clear that the type of collective classification that we do, and to the extent that we do it, is highly appropriate. All eight defendants filed the first petition on the same day, collectively. All eight defendants filed the second petition on the same day, collectively. The IPSA press release was issued by them through IPSA. We allege that it was collective activity. Well, the IPSA matter. IPSA is not even a defendant. They aren't even a defendant. They're not a defendant, but they don't need to be a defendant. Oftentimes, the publisher of a statement, the instrument through which a statement is made, is not a defendant. It's a third party. Well, there needs to be, but there need to be concrete allegations that would indicate, even if that were true, that somehow or other they were an unindicted co-conspirator. Well, not indicted, but co-conspirator. Well, there would still need to be allegations that Defendant A talked to IPSA about doing this, and that Defendant B did that, and they arranged to have IPSA issue this on their behalf. There's none of that. And I mean, the fact that this is an allegation of an antitrust conspiracy doesn't relieve you of showing that individual actors did things that contributed to the existence of an agreement. I mean, does it? Well, I think it does, Your Honor. Oh, really? Well, I think that the IPSA's own press release that was issued back in September of 2018 makes reference to the fact that it's their supporting members that are a part of this. This is an organization that we allege is controlled by those supporting members. It is an instrument of those supporting members. Again, we're at the pleading stage here. We don't have the facts of who called what and when, but for eight folks, eight different manufacturing companies to be able to come together and file a petition on the same day, making the same allegations, making the same outlandish allegations, and then to do it again in a different set of circumstances on another day, and to come together and make the same allegations in a press release issued through an organization that we believe that they control, I can't say, of course we can't say, who set up the Zoom conference or the meeting or who called who first, but clearly there was coordination, clearly there was communication, clearly there was a consensus. Well, clearly, you can say clearly, but clearly doesn't necessarily, isn't necessarily the word I would think of juxtaposed to the allegations of the complaint. I mean, the reality is that there are conspiracy complaints that do allege that Joe Blow talked to a conspirator and they did X, Y, and Z. I mean, it's not impossible to do that. I mean, whether you have done it here or not is another question. I mean, the fact, and note, note the critical point here in some ways, as I believe it's Twombly, is it's not enough that their conduct be parallel. I mean, they have their own independent reasons for doing what they're doing and business judgment reasons, and they're moving in track. But that doesn't mean that that's, there needs to be more. So why don't you, why don't we just use Twombly and tell us why you have, you have allegations here that would cross the boundary of parallel coordinated conduct. I completely agree with you, Judge. If this was simply parallel action, if each of the eight filed their own separate actions and their own separate press releases and their own separate petitions, and you'd have the parallel but differing aspects for us to come in and say, oh, that's all a conspiracy without having the phone call or the email, which of course we're not going to have. The nature of antitrust conspiracies, as we all know, is that they're clandestine, that they are hard to broach from the competitor. Well, they're hard to prove, but that doesn't mean that people don't do it. I mean, the fact that you haven't done it doesn't mean that people don't do it. We will do it if we have the opportunity to conduct discovery. This is not a motion for summary judgment where we've gone through discovery and we haven't been able to obtain the evidence that you certainly would rewrite in insisting upon at the summary judgment stage. But this is simply the notice stage. This is the pleading stage. And we're not suggesting for a in unison, but in unity. That reflects the conspiracy. That reflects the coordinated activity amongst them to keep somebody out of the market. There's a petitioning activity itself. I mean, that that is going to be you're going to run into the problems with North Pennington on that, right? Or the petition? We certainly recognize and try to address those, Your Honor. I mean, we do urge this circuit to adopt the standard adopted in the seventh, the eighth and the ninth concerning material misrepresentations, intentional misrepresentations. And that's what we think happened here is that the petition, it's not so much the act of filing a petition that it's the inclusion in that and the use of that petitioning activity, knowing that fraudulent misrepresentations are being made of an extraordinary nature. I mean, they go in, for example, on the average dumping margin, which is the core of their suggesting that it's 1700%. Yes, I understand at the end of the day, the ITC finds that it's 57.03%, a mere fraction of it. That is a win. But it would be making a mockery of North Pennington to allow a petitioner to use the petitioning process, basically as a platform to destroy competition. Let me ask you about the materiality though. This was independently investigated by the agency. How can you say that anything false stated by, that you allege was false, stated by the defendants affected the agency's decision? The agency rejected the parts that it did not find supported, but found enough to give an adverse ruling to you. In that circumstance, anything that was a misrepresentation or alleged to be a misrepresentation doesn't seem to be material. How do you deal with that issue? Your Honor, there is no question, I think that the average dumping margin, that particular issue is highly material. Obviously, that's one of the critical findings. What we're suggesting is even though there was ultimately an independent investigation by the ITC, and they found that the dumping margin was 57.03%, it would make a mockery of North Pennington to basically allow someone to come in and make any allegation they want, particularly when they know it's false and it goes to a material element, and then to say, rely on, well, as long as there's an independent investigation and there's some win at the end of the day, we're fine, and we're protected, and we have immunity. What does it mean to be material? Does it material at least mean that it affected the outcome? It's an issue that goes to the outcome. I mean, the average dumping margin is a material issue. And we do think beyond the average dumping margin, which is where they conducted their independent investigation, the ITC relied upon and cited in their decision what we alleged to be false statements about excess capacity to produce the mattresses in the box. And I think, Judge Holmes, I never answered your second question. We do specify in the complaint that the product at issue is the mattress in a box. These are the kind of new fangled mattresses that you can order online, that they come to you in a box and they expand out kind of like almost, you know, anyways. I get that, but that's the whole general nature of this complaint. I mean, we're talking about specific mattresses in the box or specific products that are made by a specific defendant. It's not that difficult, I mean, to be able to do that. And I don't recall that being done. They're trying to keep our brand of mattresses in the box out of the market. And they have 74% market share, and I may be off on that statistic, 70 something percent market share. They control the market and they want to keep it that way. And they want our product, the mattress in the box, form of a mattress. And yeah, there's several different... No, I'm sorry. I thought the Made in America allegations went towards their products. They were saying their products were made in America. That's right. Well, then you should be able to identify which one of their products they claim were made in America. And I don't recall there being any allegations saying product A, made by a defendant, they allege was made in America and in fact was not made in America. Well, our focus is on their anti-competitive behavior is keeping our mattress in the box out of the market by making these allegations and the Spear campaign and these fraudulent and falsified petitions saying that ours are not made in America and theirs are. It's the context in the anti-competitive behavior is it's not so much aimed at what they're doing in terms of their manufacturing, but the manner in which they are keeping us and our product out of this market. No, I get that. But I think what you're... Explain to me where I'm missing it. At least what I'm understanding you to be saying on this Made in America point is comparatively, I, my product should be viewed the defendant saying this, my product should be viewed as more favorable to the market because mine is made in America and the inferences yours isn't. And you're saying it's false. Your juxtaposition is false because your product was not made in America. Isn't that supposed to be the theory? That's part of our theory. Yes. Okay. Well, as it let's take that little part. And as it relates to that little part, it would seem imperative or at least important for you to set, to identify which products the defendant is saying they have a comparative advantage on that were made in America. There are no such allegations. They're just this collective defendants say. Judge, I'm not going to argue the point that we could not have been more, that we could always be more specific. I have been doing this for 32 years, drafted complaints, adjudicating complaints. I get that there is always an ability to be more and more and more specific. And I think that I'm not going to say that's unfair, but I think we clearly give notice to the defense as to what our claim is for you to ask those questions. I think reveals the fact that we all understand what the allegations are here and they are sufficient to put, to identify not only the activity that we believe is anti-competitive, but the manner in which the defendants individually and collectively are working together to keep us out of the market and the effect and the damages that that is having on our client, our business. And when you put those together, I just really believe what we have here. And I know I'm over time at this point. Anyways, that's the best I can answer you at this point, Judge Holmes, is that, yes, we can always be more specific, but I think your very question reveals the fact that we have given notice at this stage. And these conspiracies are by definition clandestine. They are not something that we can see. All we know is that we're being excluded by what they're doing. All we know is that they are lying from our perspective, making material misrepresentations to the ITC in their petition. Mr. Larson, let me hit the pause button for a second. Yes, we have gone over time, but yes, this is our only case for this morning. So if my colleagues have any questions right now, we can entertain those. Otherwise, we'll give you a little time on rebuttal after we allow for a fulsome presentation by Mr. Curran. Are there any questions from my colleagues before we? Okay. Mr. Larson, then you'll stand down, please, and then we'll hear from Mr. Curran, and then we'll get back to you. Thank you. Good morning, and may it please the Court, Christopher Curran for the Defendants Appellees. Like Mr. Larson, I think I'll begin with a consideration of the procedural posture of this case. In the first instance, in this court, the question of appellate jurisdiction, because I think it's pretty clear under Moya that we have a problem right now and that the order appealed from was not a final decision under 10th Circuit controlling authority. Well, it's pretty late in the day to raise that, Mr. Curran. I know that we have an independent obligation, but if it was so clear under Moya, why are we sitting here in the 11th hour talking about this? Well, because in the plaintiff appellant's brief, they characterized the order below as a in our brief. But it is a problem, and it's in the nature of subject matter jurisdiction. It is curable as we identified in our motion, but it's definitely a problem because the district court's decision at issue here in the opening paragraph said it was granting a motion to dismiss the complaint, not the action. And in the final paragraph of that decision, it, of course, granted dismissal with prejudice as to certain claims and without prejudice as to certain claims. I think the only way to read that is that the court was entertaining, was willing to entertain a motion to amend the complaint by the plaintiffs as to certain of the state law claims that hadn't been adjudicated first time round on the initial motion to dismiss. And let me give you an alternative way of reading that, and you tell me where this is wrong. The first time around when there was an amendment of the complaint, the court actually offered to allow them to amend, as I recall from the hearing, and then a motion was filed after that, invited them to amend. They filed a motion to amend, an amendment took place. And in that context, there was no separate motion filed. There was just, the court allowed them to do it, welcomed that amendment. So they did the amendment. This time around, the court, they put in their response brief that they wanted to amend, or if there was a, you know, if the court was going to dismiss, let us amend. Well, there was no invitation this time by the court to amend. There was no taking them up on their offer to allow for an amendment. So juxtaposing those two situations, which are similar in what one of the things that I focused on, and going back and looking at the record, is in both situations, the plaintiff should have filed a separate motion, but they did not initially. But the way the court treated that was different. In the first situation, the court invited an amendment. In the second situation, the court did not. It entered in, it purported to enter judgment. So why is this a Moya problem? If you look at the fourth prong, I think of Moya, that talks about other indicia that suggest finality, why isn't this final? I mean, they had one go round and the court didn't give them an opportunity to do a second go round. Yeah, because the first time around, Chief Judge Holmes, the district court said, and this is on page 243 of the Appellee's Supplemental The district court judge said, now, because I have dismissed this complaint without prejudice, plaintiff may seek leave to amend its complaint. So in my view, that's the district judge saying what he intends by the phrase without prejudice. So when we, in contrast to the juxtaposition you were proposing, I propose that that language applied to the subsequent dismissal of the amended complaint, in part without prejudice, necessarily indicates that the district court intended for there to be a motion to amend the complaint, to a motion to amend the amended complaint. And the use of the words without prejudice in that decision, I think I interpret as an invitation to go ahead and file a motion for the amended complaint. I do take your point that it probably would have been procedurally posture for procedurally proper for the plaintiff's first time round to file a motion to amend the complaint. And they didn't do so. They just went We thought about raising an issue at that point. But here, they could have either moved to amend the complaint or just gone ahead and filed a complaint if they read the court's decision as inviting that. But if they had filed a notice of appeal 45 days after this last order, you would have asked to, I'd be surprised if you hadn't moved to dismiss the appeal as untimely. Well, in that circumstance, I think it would have been incumbent upon us to research 10th Circuit law and get comfortable on what the law is. And I think we would have said that there wasn't even a final decision in the district court. So even in that case, it would have been a premature appeal. Here, as this court has established already, this is curable, right? Well, it is curable. Let's first pursue whether we need to go that route. What indicia do you have that the judge didn't think he'd finished his work on the case, other than the fact that the first time he dismissed without prejudice, he said, and therefore, you can amend? Do you have any other indicia? Yeah, yeah. So in addition to that first time round, it's the opening paragraph of the decision at issue. It's the closing paragraph of the decision at issue. It's the fact that there was never any separate. What do you have in the opening paragraph? And the court's decision, by the way, is attached to the plaintiff's brief to your honors. And that's on attachment three. And the opening paragraph says, before the court is defendant's motion to dismiss the amended complaint, defined as motion. Having considered the briefing, the record and the relevant law, the court concludes the motion may be resolved without oral argument. For the reasons discussed, the motion is granted. So it's granting a motion to dismiss the amended complaint. Moya and other cases talk about the distinction between dismissing a complaint and dismissing an action. Only the latter is a final decision under 1291. How often do we get an order that says from the judge saying, therefore, I'm dismissing the action? I don't think that's very common language. We usually talk about dismissing the complaint. Well, sometimes we do. And as we put in our motion, you know, in the District of Columbia, where I'm sitting right now, the D.C. Circuit has a different rule. There, this would be a final decision. And in the Fourth Circuit, I live in Virginia. In the Fourth Circuit, this would be final decision. But under 10th Circuit controlling law, it's not a final decision. But it's curable. And our only dog in this hunt is we want to make sure what this court does is an unassailable decision that can't be challenged for subject matter jurisdiction or appellate jurisdiction later. So we're not trying to cause any difficulty here. We're not trying to avoid any outcome now. In fact, we want an outcome now. But I felt it was incumbent upon us to call the situation to the court's attention because the way I read 10th Circuit controlling law, including Moya, we've got a problem here that that should be cured. Well, well, Mr. Kern, irrespective of whether we end up agreeing with you, the fact that you're raising a good faith concern, I applaud that. That's great. That's fine. I'm not questioning that. Let's let's talk merits for a second, unless there are further questions right now on the jurisdiction issue. In part, you rely upon HALCO versus Environmental Incorporated, a panel decision of ours. And this is on the North Pennington question, at least my recollection is. And my concern is, it doesn't seem to me that HALCO is very helpful in that in that case, there were efforts to lobby a county board. And that really is not relevant to the letters that we have at play here, is it? I mean, to the press releases that we have play here? Well, of course, Chief Judge, we don't rely just on HALCO. HALCO, of course, did result in a dismissal. And that did involve publicity, an alleged smear campaign. We've also got Allied. We've also got Air Capital. We've also got Sunrise. Well, let me well, I'm winnowing. I'm winnowing. And so what about HALCO? I mean, do you defend that reliance on HALCO? Is HALCO distinguishable? Does HALCO help you? I think HALCO helps us because in listing the the allegations that supported the claim there, one of the elements was a media campaign smearing the plaintiffs. And that and the court, you know, I think it was an affirmance of a dismissal under Norr Pennington. So it was necessarily including press statements in the Norr Pennington scope. And while that may have been legislative petitioning, here we're talking about executive branch administrative agency petitioning. Yes, but the press releases were not going to the administrative agency. The press release were directed at furthering the purposes of the organization that issued them. I mean, the I guess the point, the point of distinction that I'm getting at in HALCO, it appeared that they these were an indirect way to lobby the board. And who's being lobbied in this situation where you're issuing press releases after the agencies have acted? No, no. Well, I understand the question. But no, no, the press releases were not after the the filing of the petitions that those dates match up in the in the in the amended complaint. So when the petitions were being filed, press releases were issued. They weren't to smear anybody. They were in support of the petitions because these agency proceedings at the Department of Commerce and at the ITC depend on the cooperation of industry participants. So when a petitioner files a petition, they're hoping that other industry participants will engage with the Department of Commerce and the ITC and provide requested information so that those agencies can reach an appropriate decision under the anti-dumping laws. And Your Honor, this isn't just my post hoc rationale for these press releases. Paragraph 305 of the amended complaint acknowledges that the press releases had the purpose of enlisting support among industry participants for the petitions. And as Your Honor has kind of already acknowledged and as Judge Hartz acknowledged previously, those press releases were successful in the extent to the extent that industry participants did cooperate with the Department of Commerce and the ITC. And those agencies ended up with a full record on which to make their decisions. So even if the law were not as strong as we think it is under Allied, Sunrise, Air Capital and Halco, even if the law were like the whisk arrow case that the plaintiffs cite for the first time in their reply brief to Your Honors, even if that were the law, we'd still have a defensible position on the press releases because there the touchstone was whether the press releases in question or the media campaign in question was supportive of the prosecution of the legitimate petitioning activity. And here it plainly was, even as alleged by the plaintiffs. This is not a situation like in what like perhaps in whisk arrow where somebody issues broad blog posts. And that, by the way, was not the same need to foment support among the industry because, of course, in a court, there's mandatory subpoena power and other mechanisms to ensure that witnesses can be heard or will be heard. But the Department of Commerce and the ITC rely on industry participants to voluntarily provide information so those agencies can make their decisions. So so so let me let me stop you because I want to drill down on a case that I came across that I didn't see cited, but just the general principle I might be able to talk about and get your response to. But but let me make sure I understand your theory first. So the point would be that that these press releases were directed. Really, their focus was directed at third parties to get third parties to bolster the existing petitions by their willingness to cooperate and provide information to the regulatory bodies. Correct. OK, that that therefore it is sort of indirect support of litigation that is currently going on. Well, not litigation, but but administrative actions. Right. Right. OK. One of the cases that that that I came across anyway was the art cartoons case. And in our cartoons case, there was specifically this this episode involving a threatened litigation letter, a cease and desist letter, essentially, that was sent by a lawyer from Major League Baseball to the person who was going to be printing the card, telling them to cease and desist. And the question was whether, in fact, that could be deemed to be petitioning activity. It was indirect activity, activity to a third party in anticipation of presumably future litigation. If that litigation came to pass, we said no. Now, I didn't see that case reference, but just the general principle of that explained to me why cartoons actually does not support your opponent in the regard to the question of whether this would be conduct that would be immunized or not. Yeah, you're right that that case is not cited in the briefs here. I have read it and I recall the long and tortured history. I think it had an en banc decision somewhere. It did. And I'm referencing the en banc decision, actually. So so that was conventional litigation, not executive branch administrative procedures. So that's more in the whisk arrow camp rather than in our current camp. I also have some question about the continued viability of cartoons after subsequent decisions. But in any event, I would put it before. Like I said, we've got a little bit of time here before you pivot. What subsequent decisions are you talking? Yeah, frankly, I'm not remembering the date of cartoons, but I know it was I know it was earlier. It's 2000. So it's the en banc decision. Yeah. So maybe it was CSMN, a subsequent decision of the 10th Circuit addressing Norr Pennington that I have in mind. And that case, by the way. Well, it did a number of things, right? It extended Norr Pennington to non-antitrust claims as petition clause. It also adopted the pre-Sham exception rule for those petition claim situations, petition clause situations. And it also attempted to reconcile certain prior decisions by the 10th Circuit and the Supreme Court on Norr Pennington theories. I think CSMN specifically said that B, E and K supersedes anything to the contrary in cartoons except us to determine what was contrary in B and K. But we've acknowledged that cartoons may be questioned in some respect because of the subsequent Supreme Court decision. OK, thank you, Your Honor. And and I guess also I would just emphasize the different factual setting. I don't know. I don't know if I remember reading cartoons and wondering, should that really be the law that a pre-litigation threatening letter is not covered when the ensuing litigation is covered by Norr Pennington? But even if that, even if cartoons is still good law, it's factually distinct from our circumstances. All right. Give me that then. Why would there be factual distinctions that matter? Because as alleged in paragraph 305 of the amended complaint here, the press releases were supportive of the petitioning activity that is plainly protected under the Norr Pennington doctrine and the petition clause immunity. Whereas in cartoons, I believe it was the threatening letter was was sent not not, I think, just to the infringing party, but also to the infringing party's customers or something. Well, yes. Yeah. And that. By definition, under the holding in cartoons at that time was considered not supportive of the litigation, the litigation had even begun. There hadn't been litigation in cartoons, whereas, of course, we have a petition here. And I guess your theory in part was that this was in support of an existing petition. Right. Yeah. And the amended complaint also alleges expressly they use the word concurrent to describe the press releases. And you can see from the dates provided for the press release, including the one for the Trade Association, that the dates are, in fact, concurrent to the I think to the exact day of the filing of the petitions. So this was here. The press releases are part and part of the petitioning activity. If you if all you did was file a petition and then close your door, put your hands under your under your hips and do nothing else, the chances of your petition succeeding are significantly diminished here. You have to rally domestic industry support and get other participants to participate in the agency process. OK, as as as enjoyable as this this argument is at a certain point, we're going to have to call time. So why don't we do this no more than six minutes over, Mr. Curran, and then we're going to allow Mr. Larson to have rebuttal. You can stop now if you like, but I'm just giving you a hard time to end. Can I ask him a question? Of course. So your opposing counsel suggested that your petition alleged average dumping margins of 17 percent. Do you agree with that? That's what your petition alleged. No, the petition complied with the law. The law requires that a petitioner provide the Department of Commerce, by the way, is not not the ITC who determines dumping amounts. It requires the petition to contain information reasonably available to the petitioner as to the dumping taking place. And recall when you're if you remember the domestic industry, you don't have perfect insight as to the pricing and the costs of a foreign manufacturer selling through a through an importer. So all you can do is provide the information you've got. And that's what was done here. Commerce, the staff, first reviewed it at the petition stage, found that it was adequate and accurate, and then did so again at the preliminary stage and at the final determination stage. This was not an allegation of average dumping. This was information available to the petitioners. It's not a representation that every foreign manufacturer is dumping at that level. It's just an allegation that this is the information we've got. And your honor, if I can indulge you to take a look at page 40 of the appellant's appendix. So this is volume one of five of the appellant's appendix, page 40. This is the Department of Commerce final determination of as to China. And we can see on page 40 in those first two columns of text up top, the Department of Commerce expressly corroborating the dumping that the highest dumping margins alleged in the petition. That's the ones of 1700%. And then on page 40 and page 41, there's the listing of the final dumping margins that the Department of Commerce finds. And yes, one of the plaintiff's foreign manufacturers got an estimated weighted average dumping margin of 57.03%. But the complaint alleges that that's their primary manufacturer. They have other customers too. And even beyond their customers, if you look at all the other dumping margins that are found here, you go to the end, the China wide entity, which is basically all others, all other China manufacturers of these mattresses got the dumping margin of 1731.75. So not only were there good faith allegations in the petition, there was corroboration at every step along the way. And the final margins were in line with those allegations. And that's all explained in the text that I've referred to. And one irony of all of this is when commerce was corroborating these dumping margins, including the 1700% number, they found corroboration in the transactions of healthcare, the plaintiff's primary supplier. So not only, so the claims, I think the word that Mr. Larson used was outlandish allegations. No, nothing outlandish. In fact, ultimately corroborated factual allegations. The idea that this is fraudulent or misrepresentation, that's categorically foreclosed by the allegations of the amended complaint and by the documents that are incorporated in that amended complaint, such as the commerce's final determination. Right. Any further questions? Thank you, counsel, for the very fine argument. What we will do, Mr. Larson, is you'll have six minutes rebuttal if you want it. You don't have to take it. And that will bring this to a close. Please go ahead. So Judge Holmes, if I can, I'd like to quiz Mr. Larson for a minute. Of course. So listening to your... You're muted, Mr. Larson. So Mr. Larson, you are muted, but I'm going to go ahead and pose my question here. So listening to your opposing counsel's argument, I guess my question to you is, how is this different? I mean, it seems like in any petitioning activity, any litigation, you're going to have instances where a party is highlighting the most egregious examples in support of their petition. It doesn't make the... And the egregious examples may be a weight in the end, but it doesn't make them fraudulent. I guess I just like your response to how... I mean, we focus on these 1700% dumping margins as being incredible and misrepresentative of things, but how do they get you across the goal line? Fair enough, Judge Carson. And I think I never finished answering Judge Hartz's question about the materiality of the reliance on various, what we believe are misrepresentations. So I will do that and answer your question hopefully at the same time, because I think they're connected and they do get us across that goal line. Not only do we have what we consider to be egregious mischaracterizations on the average dumping margins, but... Okay, hold on. Hold on. Let me stop you. So like the 1700%, you're not telling us today that they characterize that as an average dumping margin, are you? No. Listen, I'm not going to... Because there's a difference. If in their petition, they're saying, hey, there are egregious examples of dumping margins in this context. There's a 1700% one over here. There's a 1400% one here. They're not saying that that's the average, right? As I think I just heard from counsel concede that the primary manufacturer is the number that we gave, the 57.03% is the one... There are other instances as alleged, for example, in paragraphs 223 to 26, that the ITC relied upon and cited false statements about excess capacity to produce the mattresses in the box. I mean, don't you have to tell us? I mean, isn't that conclusory? I mean, don't you have to tell us what the false statements were that they relied on? I think we do identify them in these paragraphs. We identify that the ITC cited to and relied upon Appellee's false testimony regarding their manufacturing and marketing. They relied upon false statements regarding domestic capacity. These are all specific categories of statements that we believe are false. Again, this is at the notice stage. If we were at summary judgment and we did not have... We were still at a point where we could not identify this after discovery, I certainly recognize that. Whether or not the ITC ultimately did rely, whether or not this petitioning activity rises to that level and is supported by the evidence of the record is going to depend on what happens in discovery. I mean, how's discovery going to show what the ITC relied on? That's a public proceeding. It's a public order. I mean, you've got to have something in that that shows... You're right. We're not going to show what... We're not going to be examining the ITC. We're going to be examining the defendants and what they knew and what they were stating we believe was false. We're going to show that this was not a bona fide petitioning activity, but that this petitioning activity was part of an overarching conspiracy to keep us out of the market. Okay. But now for purposes of immunity, does that matter? Because I mean... If this circuit does what we're urging it to do, and that is adopt the intentional misrepresentation exception that the seventh, eighth, and ninth visit, because then if we can show through discovery that as we believe that we would, that these defendants did in fact make material misrepresentation, it doesn't really matter what the ITC did. It matters from an antitrust perspective what these defendants did. Well, wait a minute. Wait a minute. This doctrine that you ask us to accept has as a crucial component, an integral component, reliance, materiality, the point that Judge Hart's made. So it does matter what they did. They had to rely on any false misrepresentation. Well, their misrepresentations that are being made by the defendants must be material misrepresentations. Yes, that trigger a reliance. And we think that there is reliance, at least demonstrated by their citation to statements and other characterizations that we think we'll be able to demonstrate are false and that the defendants knew were false. Okay. So let me ask you about that. So you allege that there are false statements. I mean, is alleging that they made some X statements and that those statements were false, I mean, is just saying that that's not true enough? I mean, does that get you across the line? I'm generally stating that there were false statements, but identifying the types of statements that we believe are false and the reasons why we think they're false. Okay. Give me an example of a false statement that you've alleged. In paragraphs 223 to 226, the statements concerning the excess capacity to produce the mattresses in a box. Okay. And what is your alternative set of facts that you allege that would show that was false? Or did you just say it was false and you're going to prove at trial that it's false? We believe it was false and we'll be able to show that through discovery that they knew that it was false. That these differences about excess capacity or manufacturing and marketing of the other fault statements, the categories of false statements, that's where we need the discovery. I mean- No, I understand. I understand. But why? I mean, you have some reason for believing it's false. We do. I mean, we rely on our clients. It's not just that you think that everything the other side says is a lie. I mean, you've got something upon which you base your allegation that it's false. Absolutely. I mean, we've certainly satisfied our Rule 11 requirements by investigating this and by talking to our clients. And I am relying on the information provided by our clients. Of course. And that's where we come to the conclusion that assuming that those allegations are true, which this court must do, which we do in good faith, relying on our client's characterization of it, we should be entitled to asking this court to adopt law that has not yet adopted. But the notion that a smear campaign, which we- And I understand there's a difference of opinion as to whether it's a smear campaign, as we allege, to keep us out of the market or not. This is the other issue raised by Judge Holmes that I wanted just to address here. And I apologize for being over my time. But I think it's really important to understand that a press campaign and a media relations campaign, that is truly intrinsic and part and parcel of lobbying and legislative activity. That's not what's going on here. This is a petition. This is quasi-court activity. This is like litigation. It's much more like whisk arrow than it is like alcohol. But more importantly, this press campaign and this smear campaign was not just designed to get support from other manufacturers for the petition. As we allege in our complaint, it was aimed at consumers, it was aimed at retailers, it was aimed at distributors. And because of that, that is clearly non-petition activity. All right. I hear a period there. And so we'll put a punctuation of a period on that. These were very fine arguments, but all good things must come to an end. So we will consider the case submitted. Thank you for your arguments. And the court will be in recess. Thank you. Thank you all. Court is in recess. Stick with the plan of reconvening in 10 minutes or two minutes after the hour, if that's fine with you. And that'll be by phone or by this? It'll be by phone. Okay, good. All right. All good. Thank you. Sounds good. Thank you. Thanks.